Wickham, J.
Heard on exceptions to inventory, to account of guardian,- and petition for removal, consolidated.
This cause was tried and submitted to the court on June 18, 1909, since which date, as we are informed by counsel for the guardian in their brief, Paul Oliver has deceased, and,.it is claimed in argument that the action or cause is abated .and must be -revived in the name of the personal representative befor'e the court is authorized to render a decision. The information’thus conveyed to the court we can not regard as judicial, and we shall dispose of the ease just the same as we would have done, had Paul Oliver lived until the present t-hue,
*181 In - order to eliminate any legal question which may arise on account of the. death of Paul Oliver, we will order and direct that the judgment of the court in this case be journalized as of the day the cause was submitted, namely, June 18, 1909. This is a sort of a nunc, pro tunc order and is authorized by In re Estate of Jarrett, 42 O. S., 199. Other cases might be cited as authority, but we deem it unnecessary.
It is argued by counsel for the guardian that this cause is not submitted until briefs are received .by the court, as it was understood at the trial that the cause was submitted on brief instead .of oral argument, but we do not think that point well taken. A cause is submitted when the evidence is all presented to the court; the court may or may not hear oral argument. As a matter of convenience to the court and to counsel themselves, the views of counsel .are often presented on paper. In fact, the court may, if it sees fit to do so, dispense with argument altogether and render a decision in the case when the presentation of evidence is closed, so that we consider this cause was submitted on June .18, 1909.

Res judicata:

It is also argued by counsel for the guardian that the matter of the removal of the guardian is res judicata.
A decision of this question is not material, and as counsel will no doubt agree with the court it is not necessary to take the time and space to enter into a discussion of that question. A pro forma judgment of removal of the guardian will not affect his present status:

Shambmgh’s right to file exceptions:

This question has been adjudicated'by another branch of this court, Judge Nicholas presiding, and so far as we are concerned that question is settled: We- will not review the judgment of Judge Nicholas on the demurrer to the exceptions, but will proceed to a 'consideration of the questions made by the exceptions to the inventory and to the account of the guardian.

Exceptions to the inventory :

The exceptions to the inventory are sustained. The so-called inventory fled by the guardian is no such inventory as the laiv requires to be fled by a guardian. It appears from the evidence that it was prepared by the guardian himself, probably without *182 any legal advice, and is altogether insufficient nor is it complete. The proof shows that there are assets belonging to the estate which are not included in the guardian’s inventory.

Jones claim:

The guardian failed to inventory the claim .against Jones. Tt appears from the evidence that money had been advanced by Oliver to Jones to the amount of $3;400 to buy the house known as the Stacher house. Other cash items advanced, $1,500 and a note of $1,000 in addition'to that Jones received from the proceeds of the sale of the Pine Bluff lands, $1,200, making a total'of $7,1.00. This amount should be set out in the guardian’s inventory as an asset of the estate of Paul Oliver. It appears from the evidence that afterwards Jones presented a claim against Shelley as guardian for the amount of $1.0,000 for board, care, etc., of Paul Oliver coVering a period of years. My recollection of the testimony, and I have only -my recollection to rely upon at this time, is that this sum claimed by Jones and his wife for board and room and other services rendered Paul Oliver was about $200 per month, making a charge of about $6 per day, in round numbers.
This claim the guardian allowed and not only relieved Jones from the payment of the $7,100 but actually paid him in settlement the sum of $2,600. This looks to the court like an exorbitant charge for board and room, and it is doubtful whether the guardian • was justified in allowing the Joneses the amount he did allow them in settlement. The court is impressed with the view that it was either extraordinary board or an extraordinary price charged by Jones. ■

Earidon claim:

The Earidon claim was inventoried at $2,977.51, when in fact it was $4,277.51. The guardian received from Earidon in cash $2,977.51; he had allowed Earidon $1,300 on Earidonclaim against Paul Oliver for services rendered covering several years past. This error was admitted by,the guardian at the trial and he admitted that the amount of Earidon-s claim ivas $4,277.51.

Value of the Pine, Bluff lands:

We have considered the'testimony of all'the Avitnesses on the subject of the value'of the lands at Pine Bluff, Arkansas, and Ave *183 find by taking a general average of the values put upon the land by the witnesses, that they were of the value of $12,500, and they should be inventoried at that amount.

Rush judgment:

It appears that there ivas a judgment standing in favor of Paid Oliver in Holmes county for $2,200. This a’so should be included in the inventory.

Stileel farm deal:

The guardian inventoried as the balance due from himself to the estate of Paul Oliver on note $3,177.15. It appears that he bought a farm for which Oliver paid the sum of $13,700. She!-' lejr gave Oliver his two notes, one for $10,000 and one for $3,700. The evidence shows that the smaller of the two notes was paid by Shelley to.Oliver, but the $10,000 note was never paid in full. •Notwithstanding the fact that the note was not paid, when the effects of Paul Oliver came into the hands of the guardian he tore his name off the note, and upon being urged and commanded to do so produced the note in court at the hearing.
. Honesty and prudence should have deterred him from destroying the evidence of his indebtedness to the estate of Paul Oliver and instead of exhibiting it in his inventory as “bal. due on note,” he should have set out the true amount with interest, less the actual payments made.
We may have something further to say upon the subject of this note when we come to the exceptions to the account. Suffice it to say at this time that the evidence shows that Shelley at the date of the filing of the account, to-wit. August 26, 1907, to. which date all interest is to be computed, owed $5,248.46 instead of $3,177.15 as inventoried, so that he should inventory that note as $5,248.46.

Cash from Larwell estate:

He inventories an item of $2,400 as cash received from the Larwell estate, but upon the witness stand admits that it should be $2,420 instead of $2,400 as inventoried. The inventory should show the true amount.

Exceptions to the account:

In his account the guardian should be charged with the prop *184 erty set forth in his intended inventory, all of which aggregates the sum of $58,584. To this amount should be added:
First. He should charge himself with $2,420 as cash received from the Larwell estate instead of $2,400.
Second. He. should charge himself with $5,248.46 as the balance due on the Stitzel farm note instead of $3,177.15.
Third. He should charge himself with the value of the Pine Bluff lands, which we have found to be $12,500 .
Fourth. He should charge himself with $4,277:51, the amount collected from Karidon, instead of-$2,977.51 only, which was the difference between the amount collected and the amount paid Karidon:
Fifth. The evidence in the case shows that Ihe guardian treated the property of his ward as his own. He placed it in the bank in his individual name, paid his own debts with the money; in short-, he appropriated the whole of the estate of Paul Oliver to his own use, speculated in land, paid his own debts, and kept no account of the trust property as tru-st property. As his bank account shows it was all the property of E. F. Shelley. He is, therefore, chargeable with interest on ihe funds thus appropriated to ihe date of the' filing of'his account, io-iuit, August 26, 1907, in the sum of $9,-417:16, making a total for which the guardian is chargeable of $83,892.49.

C-redils to which guardian is eivlitled:

In his -account the guardian claims credits for $41,251.88, but there are a number of items of disbursements made by the guardian to which exceptions are hied. The first is:

Fees of H. L. McCray:

It appears from the evidence that on the 13th day- of May. 1904, Paul Oliver, in company with B. F: Shelley, visited .the office of Judge McCray in Ashland. It was there stated that Karidon had in his possession certificates of deposit belonging to Paul Oliver in the sum of $26,500. According to Mr. Kari-don’s testimony, some time previous to the visit of Shelley and’ Oliver' to McCray’s office, Oliver reqiiésted Raridon to take charge of the money he then-had in bank, and Mr. Raridon, whether wisely or otherwise, complied with ’ Oliver’s request and made out some certificates- of deposit in the name *185 of Raridon to the amount of $26,500, and laid them away in the bank. This fact coming to the knowledge of Shelley, he appeared to be very much interested in securing possession of this fund himself; and it appears from the evidence in the case. that at that time Paul Oliver was enfeebled physically, and probably mentally. lie appeared to be under the control of Shelley.
We might say at this point that on the trial we were impressed with the honesty and truthfulness- of Mr. Raridon. One thing came out in the trial which indicated that he is honest. When Shelley went to him after he had received the appointment as guardian and demanded a settlement, he- was asked by Raridon what claim he had against him. Shelley replied, stating the amount of $2,777.50. Mr. Raridon at once replied, “you haven’t it high enough; make it $1,500 more and.you have got the correct amount,” and a settlement was made upon that basis. Mr. Raridon had been the agent and assistant of Oliver for some years prior to May, 1904. He claimed $1,300 for services rendered Paul Oliver, and, in his usual way, Shelley-settled with Raridon and allowed him the $1,300 claim, and received' from Mr. Raridon the difference between $4,277.50 and $1,300. It was bad management, to say the least, to allow -Mr. Raridon the full amount of his claim. I do not mean to intimate that his claim was unjust or that he was not honest in making it, but the claims of honest men sometimes bear investigation, •for it is only natural that a person will sometimes place a higher valuation upon his services than he is really entitled to receive. Therefore, I say, taking into consideration the conduct of Mr. Raridon at the time of the settlement with Shelley, his volunteering the information that he owed $1,500 more than Shelley claimed, and no one knew anything about the amount but Rari-' don-, I say when it comes to a question of veracitjf between Shelley . and Raridon I do not hesitate to believe Mr. Raridon as against the testimony of Shelley.
Going back then to the employment of Judge McCray, Raridon had the $26,500 in his possession in the shape of certificates of deposit. Shelley wanted to get his hands upon it and he went to Judge McCray for legal advice. I am aware.that Judge McCray and Shelley both say that the contract of employment *186 was made between Judge McCray and Paul Oliver, but they do not agree in the important part of their testimony. The only persons present at the time of that alleged contract of employment was Judge McCray, Paul Oliver and E. F. Shelley. Shelley says that Judge McCray told Paul Oliver that he would charge him $5,000 to secure the certificates from Raridon; that it was a very difficult undertaking, requiring great skill and legal acumen, and he must bo well paid for it; and on the other hand Judge McCray testifies that Paul Oliver volunteered to give him $5,000 if he would secure the certificates or money they represented. They both agree, however, that it was a contract with Oliver; Mr. Shelley had no part in it, and Mr.. Shelley at that time, it is alleged, had a “power of attorney” from Oliver, arid it is a significant fact that that so-called power of attorney is dated May 12, 190L The execution of the power of attorney and the legal expedition against Raridon in point of time were almost quite Or coincident. It' was decided by Judge McCray to hiring a suit, not for Oliver who had employed him, but for Shelley, against Raridon, to enjoin Raridon from disposing of the certificates. "Why he did not bring a suit for Paul Oliver is not explained. In his testimony he said, in answer to the question whether he considered Oliver incompetent to transact busiriess, that he did not. He said further that he regarded Paul Oliver’s feebleness physical rather than mental. The fact_ that Oliver had executed the instrument called a power of attorney would not preclude him from bringing a suit against Raridon in his own name to recover the certificates of deposit, and the suit was not even brought in the name of Shelley as attorney but individually. The petition was filed and a temporary injunction was granted by Judge Campbell and served upon Raridon, and he was restrained from disposing of the certificates of deposit.
' And now we come to mention a transaction that has had no parallel in our experience, coming from a man on the witness stand who has been long a member of the bar and has occupied the honorable office of common pleas judge. A Mr. Hissem, an attorney of Loudonville, was employed by Raridon when’ the sheriff appeared and served the summons upon him. Judge McCray knew that Hissem was Raridon’s attorney, and he testifies that he telephoned to Hissénv; that Hissem came to his office,' and *187 that he agreed with Hissem to divide the $5,000 with him if he would assist in securing the money. from Raridon. In other words, McCray, as attorney for Shelley, and'Hissem; as attorney for Raridon, entered, into a conspiracy by which the result sought to'be attained was the recovery of the certificates, $5,000'taken for it and divided between them.
■ These facts can not be well disputed because they are testified to by Judge McCray himself. He said, “I had already phoned him (Hissem) and he knew the conditions under which'T filed this petition, and that if the ease could be got rid of without any further litigation, Mr. Hissem was to share in those fees.” After he had phoned him, Mr. Hissem, he says, came to his office, and there the agreement was made to divide the fees that were to be paid out of Paul Oliver’s property. Judge McCray then knew that Hissem ivas the attorney for Raridon, because he previously stated in his testimony, “Mr. Hissem came here and I had talked with Mr. Hissem about the matter, and he had done some advising at the other end of' the line so far as I knew, and I and Mr. Hissem had substantially arranged for the $26,500 to be turned over to Mr. Shelley.” There were only two ends to the line, ■Raridon was at one end.and Shelley at the other, so that when Judge McCray said that Hissem had done some advising at the other end of the line he knew he was the adviser of Raridon. If that story -is true it is as disreputable a piece of business as I'have ever hnown two attorneys to engage in.
But is it true? We have doubts about it. Mr. Hissem is dead and his story can not be heard. Mr. Raridon paid him $15 for the services rendered to him. I would rather believe that there was no such disgraceful act consummated by two members óf the bar of Ashland county, but rather that McCray got the whole $5,000 and pocketed it instead of paying $2,000 to Hissem.
But after all it was much ado about nothing. There was no trouble in securing the certificates of Raridon. He had no intention of running away with the money. He had it in his possession at the recpiest of Paul Oliver. Oliver had become weak physically and mentally; he could be used by Shelley. Shelley saw his opportunity, and with the assistance of McCray, obtained possession of the money, to the intended profit of both McCray and Shelley. The services rendered were of no value; ■ Shelley *188 could not have prevailed in' the suit if it had ever come to trial; he could not maintain an action in his individual name against Bari don. McCray’s advice to Shelley to bring a suit was bad, and his services in bringing it were worse. They were of no value and the guardian is not entitled to any ■ credits' for that disbursement.
The exception to the .item, of $3,000 paid to IT. L. McCray in the original account is sustained.
. At the trial it appeared from the testimony that McCray had received $5,000,- but in the original account filed -by Shelley on the 26th of August, 1907, he asked credit for but $3-,000;' the other $2,000 appears later. Our consideration of this case-and judgment has nothing to do with the supplemental or corrected account filed after the exceptions were filed to the original' account. The judgment in the case should be confined to the exceptions to the original account. Therefore we take no notice of the other $2,000.
Campbell cC Semple fees:
Exceptions- are filed to the payment of $938 to Campbell & Semple; $1,498 to B. M. Campbell, and $3,099 to B. M. Campbell. .It appears that Campbell & Semple, who were partners in the law practice in Ashland county, performed, legal services for Paul Oliver, beginning about 1880, and continued for a number of years. Judge Campbell was elected to the office 'of common pleas judge and went upon the bench February 9, 1899, and retired February 9, 1909. lie could render no legal services to Paul Oliver while he was on the bench, so that all services rendered by him'ended .necessarily at or prior to the date'of .February 9, 1899. He .presented, two claims against the estate of Paul Oliver for legal services, one for Campbell & Semple, and one for B. M. Campbell himself. These claims were both presented- October 7-, 19.07. It seems- that they were made .out and verified on the first day of November, .1904. Why they were not presented sooner does not appear. It also appears from these accounts- that the Probate Judge of Ashland Cotinty approved them, and after-they were approved by '-‘McAdoo, P. J.,” they were allowed-by Shelley and the amounts named were paid. , • ■.
*189 We find that the claims of Campbell & Semple and of R.' M. Campbell were barred by the statute of limitations. Judge Campbell, in-his. testimony, said that it was his custom not to enter a charge against his client until the case was terminated. We believe that-is not the usual way of keeping books. His services commenced in 1880; he coidd render none after February 9, 1899. Therefore, all that he had earned up to the time lie, went on the bench could not be post-dated to save the running of the statute.- ■ If his accounts are just and right, which may be doubted,-they are barred by the statute of limitations. I say they may be doubted; in his testimony, Judge Campbell said that he-had received $100 on account from Paul Oliver some years before he retired from the bench. The date of that payment I am unable to recall without referring to the testimony of Judge Campbell. - It is not material,- however. The point is this: he says that when he received $100 from Oliver-in payment for services rendered, he- gave Oliver his- note. Why a man of the intelligence of Judge Campbell should give another a note for money received in payment I am not able to understand. • It is a very strange way of doing business, to say the least. I am inclined to think that .there was an unsettled account between Oliver and Judge Campbell,.at least in the opinion of Judge Campbell, -but whether Oliver -so considered the matter is not known. Judge Campbell testified that he never rendered any account or statement to-Oliver, never kept any books of account and had never advised Oliver -that he had these claims against him.-
The payment of these claims by the guardian was unauthorized and unwarranted and he should accbunt to the estate for the amounts so disbursed. ' ' ■ ;
Jenner c6 Welclon fee:
The guardian testified that he paid Jenner & Weldon $500. but he does not know what he paid it for. He paid Jenner & Weldon other fees aggregating hundreds of dollars, but this particular $500 he says he paid them and is unable to state anything- further about it. We do not believe-Jenner & Weldon ever received that $500. : ■ ‘'" .' ;
’ It is one of those credits that is set out claimed by the guardian unjustly. The exception to that item is' sustained.'
*190 The guardian credits himself with $10,000 in a lump sum for fees for services rendered by him to Paul Oliver prior to his appointment, and $5,000 for fees for his services after his appoint-' ment; total, $15,000. This is a very liberal allowance by the guardian to himself, but it is not such an allowance as any court would permit a guardian to make. The exceptions to these items ar.e' sustained.
From the total amount of credits asked for by the guardian in his account, $41,251.88, there should be deducted the total'of the items of credit disallowed; fees to McCray, Campbell & Semple, Campbell, Jenner & Weldon, and the guardian, to-wit, $24,-035.00, and it will leave a balance of $17,216.88, the correct amount of credits to which the guardian is entitled. • To this amount should be added the interest on credits, which we find to. be $2,428.10, making a total of the amount of credits to the guardian of $19,644.98.
In addition, to those credits, and in view of the fact that the guardian has been charged with interest for the whole amount of money coming into his hands, we have decided to make him an allowance of the usual percentage allowed to representatives-of ■ estates to compensate him for his services. Strictly speaking, he is not entitled to compensation perhaps, but. for fear, that-without any allowance -we might impose a hardship upon ■ him'we' have decided to make him the allowance.
Computing the percentage upon the amount of money coming-into his hands we find it to be $1,797,51.
This added to the $19,644.98 makes a grand total of credits' allowed to the guardian of $21,442.49. Deducting the amount of credits with which the guardian should be charged, namely, $83,892.49, leaves a balance in his hands and for which he should be required to account of $62,450.
The matter of disbursements by the guardian to the so-called heirs of Paul Oliver need not be considered. The amount of money received by him and disbursed to them should be regarded as so much money in his possession. He was without-any authority to disburse any part of the assets to them, and he should be required to- account to the administrator of Paul Oliver, when one is appointed, for the full amount of the property coming into his hands, less the proper amount of credits.

*191
Lar well corner properly-:

In May, 1905, Shelley purchased some real estate in Loudonville known as the Larwell corner property and paid for it with funds belonging to his ward. - The purchase price was $9,000. He took the title in his own name. After, the purchase he stated to different persons in Londonville- that he had made an investment of Paul Oliver’s money. His testimony in -regard to his statements about the purchase conflicts with the testimony of Mr. Bowman and Mr. Schmidt. These two witnesses are altogether disinterested and there is no inducement for them to misrepresent the facts. It was shown on cross-examination that Mr. Bowman and Mr. Shelley had not -been the best of friends-prior to the time of the ■ purchase of the. property, for the purpose of discrediting Mr. Bowman’s testimony in regard to Shelley’s statements to him. Standing alone we would not hesitate to believe Mr. Bowman, as against Shelley, but Bowman’s testimony is corroborated by the testimony of Mr. Schmidt. Mr. Schmidt is a farmer-banker and belongs to that class of Germans who are unable to falsify successfully. With his testimony, to the effect that Shelley, state to him, or in his presence, that he -had made an investment of Paul .Oliver’s-money, there can not be a shadow of a doubt that Shellej^ made those statements both to Bowman and Schmidt, notwithstanding his -testimony, to the contrary. These statements show conclusively that at the time- of the purchase he regarded'it as an investment of Paul Oliver’s money; and' whether he so regarded- it or not, we find from the evidence that it was an investment of money belonging to his ward and he should account for it.- Taking .the title to the property in his own name at the time of purchase is indicative of the manner of his management of the estate of his ward.
There can be but one answer to this question. By his manner of dealing with his ward’s estate, Shelley has not only shown himself incompetent but reckless and dishonest as well. His payment of claims for services, legal and otherwise, without question or investigation, shows his incompetency. His conversion of his ward’s estate to his own use, the purchase of real estate with his ward’s money and taking the title in his own name, claiming enormous fees for alleged services, and actually appro *192 priaiing the amount claimed, shows that he is dishonest, and not fit to represent any person or estate in a fiduciary capacity. -.
When Paul Oliver became old and so infirm mentally that he was unable'to protect his own property, there seems to have been a general scramble among certain of those who knew Paul Oliver’s condition—among the foremost was- Shelley—to see who could-get their hands upon his money; Shelley, having control over the mind of Paul Oliver, first secured a power of attorney, but to afford him better facilities for appropriating the property of -Paul Oliver, he set about to secure to himself the appointment of guardian of his estate; and afterwards, and even before his appointment, with both hands, he seized-and appropriated his ward’s property. After disposing of all the available portion of his ward’s estate, amounting in round numbers to $85,000, he actually -filed a petition in the Probate Court of Ashland County to sell the greater -portion of the' remaining real estate of his ward. The evidence shows that'the probate .judge in whose court the petition was filed actually refused to issue summons upon his petition and advised him to withdraw his petition. The petition was withdrawn and the- suit abandoned. What would have become of the proceeds of the -sale of the real estate if there had been no opposition to the suit can readily be conjectured. There are other fees that remain unpaid.-
One who has guarded the interests of his ward as Mr. Shelley has guarded the' interests of Paul Oliver and his estate, ought to be.relieved from the burdens and responsibilities óf his trust.
Let °a judgment be prepared in accordance with the foregó.ing opinion, and as it goes upon the journal-as of the date of June 18th it-should include a judgment of*removal of the guardian. The- entry may show a motion for a now trial filed and overruled as of the date of June 18th, and the allowance of the statutory time for the preparation and filing of a bill of exceptions, ' . -.